The first case this morning is Allergan v. Apotex, Ms. Mazzocchi. Thank you. I'm Diane Mazzocchi for the appellants. May I proceed? Yes, please. Thank you. The district court's judgment here should be reversed because its analysis was infected throughout by legal errors. The question here is what was really an invention? Three years before or more, the 029 and the 404 patents at issue here, an ophthalmologist, Dr. Murray Johnstone, came up with the idea that you could use a discrete class of PGF2 alpha prostaglandin compounds, particularly those that had a 17-phenyl structure, to apply them to the skin to grow hair. So that was already known in the prior art. By the time the 029 patent came along, they actually tried to claim Dr. Johnstone's compounds for a similar purpose, growing hair in the context of male baldness. Well, you've got a lot of issues here and you raised obviousness and I guess you're raising slightly different issues with respect to the 029 and the 404. So let me start you with the inherent anticipation argument, which I think is your lead argument. Why would the cases, why would cases say that if the result is uncertain, there is no inherent, why would not the cases that say if the result is uncertain, there is no inherent anticipation apply here where, at least in what was going on in only a small percentage of when you were using the eye drops for glaucoma, was in fact it running onto the skin, which I believe was happening, resulting in lash growth? Sure. When it comes to the brand disclosure, I think Your Honor is referring to the brand disclosures anticipating the 404 patent. The reason why the brand disclosures anticipate is because they expressly state eyelash growth occurred. So it's not an uncertainty that eyelash growth occurred. It did occur in a percentage. Some of the time, though. It didn't occur every single time and that's what we're trying to figure out for purposes of inherency. Isn't it true that the evidence has to show that it necessarily happens all the time? Well, we know in the patients that actually experienced eyelash growth, it did occur in them. So even with Latisse, if you use it today, 100% of the patients don't experience a positive result. But what we do know expressly, not inherently expressly, is that there were a percentage of patients that experienced eyelash growth. Does it depend on what population we're looking at? Because if we're looking at the population of people who used eyedrops, necessarily only a small percentage of those will have eyelash growth because in only a small percentage of instances does the eyedrop stuff, I guess, get on the skin. If we're looking at the population of people who use eyedrops, which then extend to the skin, we're looking at a much larger population that does experience eyelash growth, right? But look at what the 404 patent itself says. The only enabling disclosure that appears supposedly in the 404 patent, and it's a prophetic example at that, is they say, over the course of six months, patients are going to put eyedrops on their eyes and some will experience eyelash growth. When it came to the data that they included, they included one of Dr. Brandt's patients, a picture of their eyes. That's it. When you look at the 404 patent disclosure, under the view that the district court held here, she basically is holding the prior art to a much higher standard of showing 100% of all eyedrop patients were somehow growing eyelashes as opposed to focusing on what the relevant population, which is the person of ordinary skill in the art, once they see that the eyelashes were growing, then there's no question that the reason why they were growing... It sounds like you're sort of mixing enablement with inherency. Enablement of the 404 with inherency with, I don't know, either the 819 or Brandt, and so I'm just trying to understand what is your inherency theory. Is your inherency theory that every single time that in Brandt or the 819, when the compound hit the eyelid skin, it grew hair? Is that the theory? I think the way in which I would phrase the theory is that the person of ordinary skill in the art reading Brandt sees very clearly that the Bimatoprost drug was causing eyelash growth. The mechanism by which that occurs has to be through the skin because, in fact, that's what Allergan told the FDA, is how this drug works, is how it gets absorbed into the skin and then you get eyelash growth. So the mechanism of how Bimatoprost was actually working is inherent, but what's expressed, and that's why the actual percentages really don't matter, because you just need to show it works in one patient to know that it actually works and to have that teaching in the art that it actually works. That's all that you need in order to know that this is what was occurring. And the reason why I bring up the 404 patent itself is that there's no example in the 404 patent where they said, aha, we've identified a patient population or we've identified a particular methodology for applying the Bimatoprost to skin where we know, we're going to guarantee you that you're going to actually get the eyelash growth. They don't do that. Well, is there a case from this court that says when a prior art reference teaches that when you perform the disclosed method in the prior art reference that sometimes you get a certain result, that's enough for inherency purposes? Sure. I think, look at the Bristol Myers versus Benvenu case that we cited in our brief. In that instance, what the court, they're focused on is the steps that were occurring in the prior art. If you were to turn that around today, would those be infringing steps today? And even though in that instance they didn't actually report, for example, that you achieved certain standards of efficacy and efficacy was a requirement to claim, because those same steps were carried out and that was the stated objective, that was enough to have anticipation. I would also point out again that eyelash growth here in the context of the Brandt references is not inherent. It is expressly taught. What is inherent is that we know because of the way in which the eyedrops were administered, the patients who did experience the express eyelash growth, it had to have contacted their skin. It wouldn't work in any other way. And in fact, their own patent specification admits that's how they think it works. And that's how they told the FDA that's the only way we think it works. So, I don't think that Allergan can really come in and say that the prior art doesn't work the way that our patent admits it works. Can I just completely shift gears? Sure. Not completely, but substantially shift gears here to the obviousness analysis. The obviousness analysis seems to me a little different when you're applying it to the 029 and the 404 because the 029 has so many, it's so much broader in terms of the compounds that are covered. So, in your view, do you have a stronger case for the obviousness just because of the scope of the 029 than necessarily would be true of the 404 where you need to identify it by MAT approach? Yeah, I think that there's different issues for the 029 and the 404 just because the scoping content of the prior art does obviously change by the time we get to the 404 patent. I think on the issue that you're on a race for the scope and the obviousness analysis for the 029 patent, that's absolutely relevant because when it comes to the district court secondary considerations analysis, the district court did not account for the fact at all that to the extent they were offering secondary considerations, it was limited to just the MAT approach and not the very broad scope of the 029 patent claims, which itself was error. When it comes to the 404 patent on the obviousness analysis, where I think the district court again started to go astray is that she, well, aside from the fact that she wrongly applied the conception issue, which I'll get to in a moment, for the 404 patent, here again, a lot of her concerns about the uncertainty in the art was resolved because Brandt had already disclosed that the MAT approach will actually lead to eyelash growth. In fact, one of the Brandt references, I believe it was at A2258, the paper concludes with a discussion by an ophthalmologist. Is that one of the references that we're talking about under 102B and 102A? Yes. Okay. So this is the Brandt June 2001 paper. At A2258, he says the MAT approach produced increased eyelash growth in 25 to 34 percent of patients in this study, a finding also seen in patients treated with latanoprost. Well, that study of treating patients with latanoprost to get hair growth, particularly eyelash growth, that was already disclosed by Dr. Johnstone back in 1997. So here you actually have an express disclosure by someone in the art recognizing the link between the behavior of the matoprost and the behavior of latanoprost. And it's actually very consistent with what Dr. Johnstone originally predicted back in 1997 when he filed the application, which published in 98, because he actually said the 17-phenyl group of compounds, my preferred compounds, these are the ones that I think I prefer. These are the ones that are likely to grow hair. How many 17-phenyl group compounds are there out there? That have actually... Well, actually, by the time we got to... We're talking about thousands or hundreds or tens of thousands or hundreds of thousands. How many are there? Well, I mean, if we were to even look at the 029 patent itself that's being asserted here, that easily covers thousands, if not tens of thousands or more such compounds. I thought I saw the district court say that the 029 covered about 100 compounds. That's not right? No. It's a much broader genus. There's many examples in the 029 patent, but when you look at the claims themselves, they're actually extraordinarily broad. So tell me again how you get from... Let's leave Grant aside because there's some questions with regard to this. How do you get from Johnstone to an obviousness analysis with respect to imamoprost? Sure. When it comes to the 404 patent, by the time the 404 patent was applied for, Lumigan had already been tested in phase three clinical trials. It was already FDA approved. There were only other two prostaglandin compounds for glaucoma that had already been FDA approved or were on the verge of it, which was latanoprost and another one called travoprost. So the person of ordinary skill in the art, having not only Johnstone, but by the time you actually get to the filing date of the 404 patent, there's really only three options that you would have available that are 17 final compounds on the verge of being commercially available that you could actually use in Dr. Johnstone's method if you're just, for example, a run-of-the-mill physician. So that's a discrete limited number of options. But moreover, Dr. Johnstone himself recognized in his original patent application that compounds in the 708 patent, which is the original imamoprost family of patents, had certain vasodilation properties that were particularly suitable for growing hair. And he expressly stated, because I understand this is complicated, I don't want to be limited to a particular mechanism of action, but he expressly referenced the 708 patent, which covers imamoprost, and they admitted that it covers imamoprost. But not HB819, but you're saying, did he reference HB819 or is that just because it's the family? Yeah, it's just the family. So he referenced the first one, the HB819. So Johnstone was in front of the PTO in a re-exam of the 404, right? That's correct. And Johnstone was also identified by the patent examiner in the Reasons for Allowance, the 029, where the examiner concluded, in light of the prior art in the file of history, including inter alia Johnstone, because he cited it right in the Reasons for Allowance, there was nothing that taught or suggested the claimed invention. That's what the Reasons for Allowance say, right? I understand that, Your Honor. So there's a little bit of a higher burden for you, given that the district court already made the findings that she made. So we've got clear error here, we've got the very same prior art references that the PTO looked at very carefully, and still the patent has survived both of those venues. So, I mean, we're not a fact finder here, right? Right, and I don't think you need to find any facts, because in fact, Allergan's own expert conceded that the person of ordinary skill in the art, having the Johnstone reference, if you just stay within the four corners of the Johnstone reference, would readily be able to see Johnstone's teachings about a saturated compound, would be able to envision what that saturated compound would look like, and would be able to name that saturated compound. And under, why don't we start with this court's case law back in Pettering and Shulman, go forward to Inrig Lave. But when you look at Johnstone, how many compounds does it actually identify that says, we know this particular compound works to grow hair? It identifies latanoprost, right? And then things start getting arguably aspirational, when they start identifying, oh, you could modify or not modify the alpha chain. You could modify or not modify the omega chain. You could saturate or unsaturate a whole bunch of carbon bonds. It starts citing a bunch of other things. These are preferred compounds. No, these are preferred compounds. No, look it over here. At a certain point, when a reference starts talking in that kind of generalized matter, in one level it's saying everything, but maybe on another level it's saying not very much at all. Well, let me address that, because I think it's very important to recognize first, in the context of anticipation, anticipation is not focusing on what is the best compound, what was your lead compound. Anticipation is primarily focusing on, is the disclosure there? Is this novel? And when you look at what Dr. Johnstone was focusing on, he had a preference, and this again was undisputed, for PGF2 alpha compounds. So that fixes a large infrastructure. He also had a preference for other compounds, too. No, but he said that those were the most preferred. And when it came to modifications to the omega chain, he said, I prefer the 17-phenyl compounds, which massively starts to restrict the scope. And then when it came to the... And then how many 17-phenyl compounds are there? Well, in the context of the ones that have actually been used to grow hair, imidapross is a 17-phenyl compound. Oh, no, no. I mean, that's where you want to get to, the ones that grow hair. But before that, just the generalized pool of 17-phenyl compounds, how many are there? There are many. But that's why I think it's important to focus on Johnstone's preferences. He says, preferably, when it comes to making modifications to the alpha chain, saturated or unsaturated. So was it your argument that Johnstone alone rendered the O29 patent obvious? I think it alone can render it obvious, but it also anticipates the O29 patent. Keep in mind, when the O29 patent was filed, they originally tried to claim what Tanaprost and many of Johnstone's other compounds, thousands of Johnstone's other compounds. And they ostensibly created these unsupported provisos that their own experts said were new matter to try to carve out Johnstone's compounds. But they were unsuccessful in doing that because they didn't exclude all of Johnstone's saturated compound teachings. If you want to say there are thousands of Johnstone compounds, they are likewise thousands of compounds covered by the O29 patent. So when it comes to the breadth, even if you want to say Johnstone's disclosing a genus of saturated compounds, the O29 patent is claiming a genus that includes all of Johnstone's saturated compounds. Did you make a brief comment on conception, the conception issue? Yes. The crucial problem with the district court's conception analysis is that there's no dispute that Vandenberg, one of the named inventors, did not conceive it all. So the only person it could come from is Woodward. There's not a single document, nobody else got up on the stand and said, this is what Woodward conveyed to me, where Woodward supposedly said, my idea is applying the matacross to my skin to grow hair or eyelashes that he conveyed to anybody else. Normally, if you're corroborating your conception, you've got a document authored by the purported conceiver who is saying, this is what's in my brain and I'm telling you. That's the document that's missing. The testimony Dr. Woodward gave was unequivocal. He has not a document that he can recall where he said, I believe you can use the matacross directly to skin to grow hair. And that's the crucial thing. A couple quick questions. When I read the district court opinion, it looked to me like she was looking at the Brandt reference as a 102 proposed invalidity ground. Was it briefed below that it was a 103 as well? Yes. Brandt plus 819? Yes. Okay. And then also, the other side is arguing that Brandt is just the inventor's own work. Was that argued and briefed below? No. Because it wasn't addressed in the district court opinion. That's correct. That was a new thing that they came up with. And quite frankly, they didn't even establish it at trial because a lot of the documents that they're relying on, it's not Vandenberg's own work. There's multiple co-authors. She never testified that she herself was controlling the third-party clinicians analogous to the way that Katz was controlling the students who were working in his lab. And quite frankly, it would have been unethical for her to be doing that in the context of a clinical trial. Did you argue before the district court that Johnstone alone rendered the 029 panalogous? Yes. Can you show me that in the record? I apologize. I don't have that immediately at hand, but I can certainly... You can bring it back up. Can you come back up? Yes. Okay. We've gone beyond your time and used your rebuttal time, so why don't we do this? Why don't we store your three minutes of rebuttal, which puts us seven minutes above? So why don't we add that seven minutes to Mr. Singer's time, who doesn't have to feel compelled to rebuttal? I won't, Your Honor, and may it please the Court. Jonathan Singer for Plaintiff Appellees Allergan and Duke. I want to respond to Judge Chen's last question on Katz. It absolutely was argued and evidence presented at trial. Where's that in the appendix? It's in our post-trial brief. If the post-trial brief is not in the appendix, I apologize for that oversight. We did not expect an argument that it wasn't argued. It's in our post-trial brief. It was in my closing argument. And as far as the evidence goes, if you... The district court didn't address it. The district court did not address it. That is correct. The district court relied on the conception to eliminate the 102A references as prior art. As far as the evidence goes, there's two Brandt references that are the subject of the Katz claim. One of them is authored by Dr. Vandenberg. Among others. It's her and Dr. Brandt. And Dr. Brandt testified, which is also in the appendix, and I will get you the site, which is at A5578. Dr. Brandt testified that Allergan chose him to present the data just as a sort of, if you will, a gesture to him. And Dr. Vandenberg testified... I'm sorry. A5578. Dr. Brandt testified... A8. A5578. Sorry, I put another A in there. But Dr. Vandenberg testified, that was Dr. Brandt testifying that Allergan just chose him as a gesture to present the data in the paper. I'm sorry. You've got to give me that number again. Okay. I'm sorry. A5578. Sorry about that. But the point being... Did you cite this in your red brief? Did we cite it in our red brief? I believe we did. If not, again, an oversight. The issue there, Judge, and all I was trying to say there is that's what Dr. Brandt testified about sort of his role in presenting the data. I.e., he's not the, if you will, the progenitor of the data. Dr. Vandenberg is. She testified at length. Almost 60% of her examination at trial was about how she designed the clinical trials. She drafted the protocol. She sent her team out. She drafted the informed consent forms. She drafted all the materials, if you will. She sent her team. Her team was going out to these clinical trial sites to record the observations of the physicians. And most critically, she was the first person to observe and be presented with the statistically significant data on the eyelash growth, and then presented that data to the Allergan Management Committee on what happened at the clinical trials and characterized the eyelash growth, among other things, as a key finding. Which Brandt reference is Brandt and Vandenberg? That would be the, ironically, it's the three-month trials, which came out in June of 2001, and they were meant to be published first. And the citation, hopefully I have it, is AA249 or AA2271? One moment, Your Honor. 2249 is the Brandt-Vandenberg. Yeah, that's Brandt, Vandenberg, Chen, Whitcup, right? Right, that's correct. So there's all these co-authors. That's correct. And I don't care if you need all of the other co-authors that are not named Vandenberg to basically disclaim that they were, I don't know, the inventors of the material inside the publication, right? Well, my understanding of Katz was that Katz needed to offer, that the inventor needed to offer, and there's no assumption, presumption made from co-authorship, as was made at the PTO, right, in the Katz case, which is what happened, and then that Katz was required to offer an explanation as to whether or not those individuals were, if you will, co-inventors of the material. But Judge Chen, the record is without conflict that Dr. Vandenberg was the individual who, as I said, designed, ran, did these clinical trials. That's, as I said, the vast majority of her testimony at trial, and that was the purpose of it. So that's the Katz issue in a nutshell. And I just wanted to answer that last question about had we argued it, and we had. On the point of obviousness, which I think was a fair bit of discussion from counsel, I just wanted to note that when Johnstone talks of, first off, the vasodilation theory that you heard, that was not presented by an expert, their expert at trial. There was a different theory offered. It was the pro-drug theory. Was it argued that Johnstone alone rendered the Otonine patent owners? It was Johnstone plus the 819 patent. That was the argument that was argued at trial, and the 819 patent is not referred to in Johnstone. The 708 is. They're in the same family. They're in the same family, fair enough. And that's a, if you will, I'm not meaning to make a point of that, Your Honor. The key point in looking at 708, first off, the vasodilation theory is not supported by an expert testimony in the sense of offered, if you will, here's why some person of skill would be motivated. They're relying on Dr. McDonald being asked on cross-examination whether or not it said that. And it does. But then it goes on to say about the 708 patent. It goes on to say meaning his… Johnstone. Johnstone. And Dr. McDonald also pointed out, you have to take the good with the bad. If you're going to rely on my expert, you have to actually tell the court what he actually said in full. And what he said was, it says that about vasodilation. And when you look at what it says about the 708 patent, it says that the vasodilation-preferred compounds are the ones without 17-phenyl. And that's right in Johnstone at, if you will, make sure I get this right, A2298. It refers to the preferred derivatives in the Woodward patent. Also preferred derivatives include those in which the omega chain has not… Can you give us the line on that? I'm sorry. Yes, Your Honor. I'm sorry. It's at line 13. Also preferred derivatives. So Johnstone talks about 17-phenyls, and Judge Chen, there are… I don't know that there was testimony at trials to how many there were. But then when he's talking about the 708 patent, he says, you want to get the ones without the 17-phenyl substitution, and there's the 708 patent. So what is he talking about when he talks about vasodilation, like 2291, 2292? He's talking about a speculated, Your Honor, mechanism of action. At the time of Johnstone, I think it was unknown how the… I think it's a little bit unknown today still, how exactly latanoprost works to stimulate hair growth. And he was speculating that because minoxidil, if you remember, that's the one you can rub on your head, that is believed to work through vasodilation. And so he was, I think, speculating that perhaps latanoprost works in the same way as well. I thought he said that latanoprost was designed to remove vasodilation because vasodilation was a negative side effect when you're treating IOP. You're 100% correct. That 17-phenyl structure in latanoprost was put on to reduce hyperemia, and hyperemia is a side effect of latanoprost where your eyes, the blood vessels in your eyes become vasodilated, become engorged with blood. So it's got conflicting teaching. At some point later, it references vasodilation may be a possible mechanism. I think the basic teaching is prostaglandin analogs. Red alert. Go test prostaglandin analogs that are like latanoprost because we now know that there's a lot of compounds out there that fit within this group that are good for treating glaucoma. And latanoprost not only is good for treating glaucoma, but it also grows hair. So let's go take a look at all known compounds or any phenyl group that treats glaucoma. And that's how you get to bimetoprost. I guess I would disagree with that. Why? And for really three basic reasons. One, the one the district court found, which is that the metaprost at the time of Johnson was known to have a different pharmacology than latanoprost because of the amide group at the C1 position, thereby showing right then and there that all prostaglandins, they're not the same. And number two, if you go that far, Your Honor, you're simply saying that it is obvious once you have one prostaglandin. And this is an enormous class. You can see in the description that you described as aspirational the amount of possible changes that Johnson suggested. And I agree that when one suggests everything, one is really suggesting not very much at all. So if we find that there's motivation to combine the Johnson and the 819 patent, would we have to reverse? No. I mean, again, if you're looking at the 819 and you say, okay, I'm going to pick from the 819, you still have to end up with an amide compound. And so you're left with Johnson teaching you esters. The 819 patent teaches a variety of compounds as well. And Dr. McDonald talked about, again, the differences between amides and the unique pharmacology that those amide compounds have. So in essence, you'd be sort of saying, okay, this teaches, go to these other, if that's what you were to find, go to this other patent, look at it, and then pull out compounds. You'd be saying one pharmacology from the Johnstone patent, I'm going to pick a different pharmacology from the 819 patent. Can I move you to inherent anticipation? Okay. And I know that we don't have that many cases, and everybody's cited different portions of the cases. But it seems to me that this is different, seems different to a certain degree from cases where we found no inherent anticipation, because the eyedrop treatment will certainly get stuff in the eyelid at some of the time. And doesn't the side effect of a treatment entail inherent anticipation? And first off, I'll disagree with your premise, but then address your question. The district court found that it's certainly a properly applied eyedrop, which Dr. Nowaker testified about, does not have to contact the skin, that that is not something that is necessarily going to occur. The district court did, of course, find that it met, and I think that's a fair summary, if you will. Is it like Visine, where you drip it into your eye and then it just gets everywhere? I think the drop size is likely smaller than Visine, and it's one drop. If you apply two drops of this drug, that's a bad thing. The drug loses effectiveness, so you only want to apply one drop. And Dr. Nowaker explained how proper eyedrop administration works. But I'm not here to fight about that the judge found what she found. But then we've got what your friend said, which is in the 404 patent, the reference is to the fact that when you get it on the eyedrop, it goes to the lid and it causes hair growth, right? I know everybody tries to get it both ways, but it seems like, at least in this particular instance, you're trying to have it both ways. I'm not trying to say, Your Honor, that the judge's finding that it may get on the skin is somehow wrong. I'm not fighting that or trying to say that that doesn't occur. But remember, inherent anticipation is about pulling, the policy behind inherent anticipation is about pulling something from the prior art that was, in fact, there, that we know was there. In applying, and what we're talking about here is the 819 patent, which is the method of treating glaucoma with the matapros. What we're talking about, multiply, is both, is there going to be an effective amount, that just from that disclosure of method of treating glaucoma with the matapros, in a patent that discloses a very broad range, is there going to be an effective amount of matapros that gets on the skin? But if there is an effective amount that gets on the skin, then this is the inevitable result, right? If there's an effective amount that gets, well, it actually, it is not the inevitable result from administration through eyedrops, if it gets on the skin, that it will grow hair. And that's the lesson of the, if you will, the Lumigan clinical trials, that not everyone grew hair, right? And in fact, in a lot of... Well, not every, I mean, not 100%. Right, and actually... And is that necessary for inherent anticipation? You know, that is a great question, but I don't think you need to reach that here, because the percentages are far lower than that. I mean, what we're talking about at the, if you want to use the later... But you used that example to enable the 404, right? Used that example to enable the 404. I mean, the use, the extent of the use, that was an enabling disclosure in the 404, right? The use of the eyedrops and the extent to which that use led to, yeah. It was used, what was used was the administration of eyedrops, but then there's a step that's left out, wiping any excess onto the skin. That's what was said. It wasn't simply the administration of eyedrop. It said it overflowed and wiped onto the skin. And again, that's actually what the example says. And that provided the thin layer, if you will, on the skin. Dr. Noah could testify that was not a, if you will, a normal way to apply an eyedrop, but that was what was stated in the patent. That's certainly not how he instructs his patients. Does Latisse work on everybody? You apply it and it works every single time? In every single person? The, to the, and I apologize, we did leave this out of the appendix. Dr. Bedingfeld testified that as to the FDA sort of standard, it worked at a, about an 80% level, but that they did observe 100% when applied. And remember, Latisse is applied directly to the skin. In an eyedrop, Judge Prost, you have to remember, remember the V-hi, I don't know if we put, we didn't. We should have. We didn't put the color pictures into the brief. They're in the appendix. It showed what happens when you put an eyedrop into the eye, is to the extent that it contacted the skin, it was sort of a random display of the green dye that you see. You see splatters, if you will. Some patients you'll see more than others. Other patients you won't see any. And with Latisse, of course, you are directly applying it to the eyelid, intentionally so, so that you will get an effective amount to grow eyelashes. But, you know, as to the question on 100%, I don't think the judge applied 100%. If you look at the percentages in her opinion, they're quite low. She was looking at certain documents, and we see from the clinical trials what the numbers actually were. Depending anywhere from 25 to 35 to 45%. 48, I think, was the highest number that we saw in any of the clinical trials. Moving to Brandt and corroboration. Yes. We have testimony from Woodward. We have testimony from Vandenberg. But where's the corroboration to back up either of their testimonies? So we have on the corroboration issue. Got those inter-office memos. Right. Really, we have corroboration of the inventive process from step one, what we are missing and why we are hearing on the arguments. We don't have Dr. Woodward writing down, I had the idea to put mad pros on the skin. That's not written down. The corroboration goes, there's both backward corroboration, and Dr. Woodward testifying in documents about monkey studies, in which monkeys were toxicology studies, their eyelash measurements were measured, and he testified from that in 1999. He conceived that it may be possible that you could apply eyelashes, using mad pros to the skin, moving forward through the clinical trials. That's all documented. And remember, the rule of reason is what the law is here. And as to the corroboration of conception prior to the May 2001 date of the Sherwood-Brandt reference, it is Dr. Vandenberg. Dr. Vandenberg, remember, as counsel stated, she explicitly testified that she did not conceive applying to the skin. And she testified, and the judge credited, and found that she was instructed by her supervisor to go to the patent attorney to discuss this application of for mad pros to the skin, somewhere between September of 2000 and March 2001. I don't have any emails or meeting planners or notes or even testimony from the in-house patent attorney to sort of lock down that that meeting actually occurred. All we have is her testimony. That's what we have. That is correct. And most of that deals with the side effects and safety issues, but where is the corroboration that goes to the hair growth? I mean, to the idea. Wow, this could also be used despite the side effects and the safety issues. Gee, this will actually promote hair growth. Right. Where is that corroboration? The corroboration, what we have is Dr. Vandenberg saying that she was told, right, to go to the patent attorney to talk about the very patented issue. Right. And the patented issue being application of the mad pros to the skin growth. She's not testifying that I observed Dr. Woodward conceive this. Right. She's testifying that she did not conceive it and that he did. She knows that. And that she went to the patent attorney, the inference the judge drew, which I think is the correct one. Is there any evidence on the discussion with the patent attorney? There's her testimony as to what it was. She testified they discussed the patent in suit and the claims to skin growth. Other than her testimony, there's an email, a letter? Judge, that's what there is. I think I addressed everything that counsel raised and hopefully satisfied. If there are any more questions, I'm happy to answer. Thank you, Your Honor. Your Honor, I can only at this point, because I don't have our full set of briefing in the pre-trial order, I can only cite you to A40 on Johnstone and 819 from an obviousness perspective. Getting back to the conception point that counsel just raised about Vandenberg going to talk to the patent attorney, all she said is I talked to the patent attorney about the side effects we were seeing in the Lumigan clinical trials. So that's where they're taking the eye drop, putting it on the eye, and she's saying to talk about the side effects. That is not what they're saying the claims require, which is application to skin to grow hair. And she also testified she was not the person who conceived. In my review of the record, I just don't see corroboration to the aha moment, you know, that we all field inventors have. Aha, this is what I can use this for. And am I incorrect with that? No, you're absolutely correct. And, in fact, I think if you look at all the cases that appellants cited, such as Marhukar, he had a prototype in hand that he disclosed to somebody else that met all the claim elements. Jolly, there was an email that was written by the person who needed to have his conception corroborated to other members of the team. Counsel just admitted they don't have that document. Woodward admitted he doesn't have that document. And particularly here, when that's the key thing that they're trying to argue distinguishes the prior art, that's simply not the, you know, they really don't have the corroboration for that. I did want to respond to a couple of points about, you know, Johnstone disclosing all of these compounds. I would note – All right, before you get to Johnstone, which is an important point, if we were to conclude Brandt is prior art, do we have to, you know, if we disagree about the other grounds for invalidity, would we have to remand that issue back to the district court to resolve the whole question of motivation to combine Brandt with 819 and then also weigh whatever evidence there is of obviousness against the secondary considerations? I think that – Those seem all like fact issues. Well, I think that on the facts that have – some of the facts that have been found and some of the admitted facts in the record, this court can certainly hold the claims invalid for anticipation in view of Brandt without having to remand to the district court. When it comes to the combination, for example, of Brandt plus Johnstone, I think that there are, again, undisputed facts in the record, some of them which came from their own expert, that established facts that could be used to avoid it. And then when it comes to the secondary considerations, there's multiple problems with their secondary considerations evidence. Notably, first, while the district court talked about some secondary considerations, she never had any nexus discussion tying them to one patent versus the other. If they want to tie them to the 029, it can't apply to the 404. If it applies to the 404, the 029 was a blocking patent. We have your briefing on that. Go to Johnstone now. Yeah. So when it comes to Johnstone, and this actually – but this does get to one of the unexpected results arguments. They don't have any evidence showing that the 17 fennel compounds, that any of them are going to be failures at growing hair. The two purported prostaglandin failures that they put in front of the district court were compounds that were not Johnstone's preferred 17 fennel compounds. And, in fact, they put into evidence with Dr. DeLong a very thick stack. What your colleague over there at A2298 pointed out, that when Johnstone was drilling down to the particular analogs of the 708 patent, Johnstone seems to really like the ones where the omega chain has not been substituted with a fennel-like structure. But look at the five sentences before that. In the very five sentences before that, also preferred prostaglandin derivatives at present are those in which the omega chain of the prostaglandin has the 1819 trinar form, especially the 17 fennel analogs, such as the 15R, 15B hydro, et cetera. That's the mataprost. That's the chemical description that encompasses the mataprost in the 708 patent. But the omega chain has not been substituted with a fennel ring structure. That's not by mataprost, right? Right, but he's saying it's also preferred. So if you want to say, in the context of the universe of 708 patent compounds, he's saying, I really like the 17 fennel, in particular, the ones that meet lines 7 through 10. But I think he recognizes there are other compounds in the 708 patent that he thought might be useful. He says, and by the way, I'm also going to prefer these other types that have this particular type of omega chain as well. So I don't think he's – and again – Okay, so let me see if I can read these two paragraphs together. Sure. The first paragraph, he identifies some big class of compounds called 17 fennel analogs that he really likes. He prefers them. By mataprost is inside that. Then when he goes to the 708, he says, but in the 708, he really liked, within that big genus, a smaller genus of compounds. And the 708, and it's as small as the subgenus that does not include by mataprost. Is that fair to say? Is that the best way to read it? By mataprost is inside the really big genus he identifies in the first paragraph. But in the second paragraph, he drills down on 708 specifically and is identifying a subgenus that does not include by mataprost. Is that fair to say? Yeah, I think it's fair to say that in the first part, he's saying, here's the set that I really, really like. And these are the 17 fennel analogs, of which the mataprost obviously is one. He did caution, though, but, you know, I also like some of these other ones from the 708  And that's fine, because this court's precedent, whether you're talking about anticipation or obviousness, the fact that you've said, here's one that I really prefer, and here's one that maybe I don't prefer as much, that's not a teaching away. When you're teaching away, you're actually saying, this is inoperative, this won't work. This is still a teaching suggestion motivation to go look at the mataprost compounds. And certainly by the time we get to the 404 patent, the mataprost was one of only three options, really, that a typical physician would be able to access. So I think that you do have that narrowing, but ultimately, if they wanted to try to suggest that there's something special about the mataprost, this particular mataprost 17 fennel, when it comes to what's the comparison you do to the closest prior art, it has to be to these other 17 fennel compounds. And they actually don't have that evidence, and they don't have the evidence that we... I'm waiting for you to come to the end of the sentence. I'm afraid it's never going to end. I'm going to cut you off. Thank you, Your Honor, I appreciate it. Thank you.